**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

LUCY, BENJAMIN, on behalf of themselves and all others similarly situated,

*Plaintiffs*,

v.

JONATHAN SKRMETTI, in his official capacity as the Attorney General and Reporter for the State of Tennessee, et al.,

*Defendants*.

Case No. 3:26-cv-00763

# PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM OF LAW IN SUPPORT

## INTRODUCTION

Tennessee's new law, H.B. 1704, purports to give Tennessee officials the unprecedented power to impose state criminal penalties on federal removal orders, and effectively expel certain noncitizens from their homes and their communities. Section 1 of H.B. 1704 makes it a state crime for certain noncitizens with final removal orders to intentionally fail or refuse to depart Tennessee—expelling these noncitizens from their homes under threat of up to a year in jail.

But that is not Tennessee's decision to make. As the Supreme Court, the Sixth Circuit, and others have repeatedly recognized, the authority to remove is quintessentially federal and rooted in the federal government's sovereign authority—authority the state does not have. Congress has exercised this authority by regulating the removal of noncitizens extensively, placing broad discretion in the hands of federal officials, and even permitting noncitizens with final removal orders to seek or obtain certain forms of immigration relief. But H.B. 1704 regulates directly in this preempted field.

H.B. 1704 also conflicts with Congress's balanced approach to noncitizens with final removal orders, under which federal officials are vested with a range of tools and broad discretion to decide whether and when to execute a removal order. H.B. 1704 runs roughshod over those sensitive decisions, setting up a system in which Tennessee officials unilaterally enforce immigration law with no federal supervision or control—which runs directly afoul of the Supreme Court's decision in *Arizona v. United States*, 567 U.S. 387 (2012).

Courts around the country have recently held preempted similar state efforts to seize control of immigration policy by enacting state immigration crimes. *See, e.g.*, *Iowa Migrant Movement for Just. v. Bird*, 157 F.4th 904 (8th Cir. 2025) ("*Iowa*"), *reh'g en banc denied* (Feb. 4, 2026). *Padres Unidos de Tulsa v. Drummond*, 785 F. Supp. 3d 993 (W.D. Okla. 2025); *Fla.*

*Immigrant Coal. v. Uthmeier*, 780 F. Supp. 3d 1235 (S.D. Fla. 2025); *Idaho Org. of Res. Councils v. Labrador*, 780 F. Supp. 3d 1013 (D. Idaho 2025) ("*IORC*"); *United States v. Iowa*, 737 F. Supp. 3d 725 (S.D. Iowa 2024); *see also Fla. Immigrant Coal. v. Att'y Gen.*, No. 25-11469, 2025 WL 1625385 (11th Cir. June 6, 2025) ("*FLIC*") (denying stay); *Uthmeier v. Fla. Immigrant Coal.*, 145 S. Ct. 2872 (2025) (same). This Court should do the same.

Without this Court's intervention, Plaintiffs and other noncitizens will be forced to leave the state or face arrest and prosecution starting on July 1, when Section 1 takes effect. Plaintiffs respectfully ask the Court to issue a preliminary injunction before July 1 to prevent enforcement of Section 1 against Plaintiffs and the class.[1]

## BACKGROUND

### A. The Federal Government Has Exclusive Authority to Regulate Removal.

"The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona v. United States*, 567 U.S. 387, 394 (2012). In the Immigration and Nationality Act ("INA"), Congress created a complex system that governs removal from the United States. *See generally* 8 U.S.C. §§ 1151–1382.

On the civil side, "Congress has specified which aliens may be removed from the United States and the procedures for doing so." *Arizona*, 567 U.S. at 396. Congress created removal proceedings and made them the "sole and exclusive procedure" for determining whether a noncitizen may be removed. 8 U.S.C. § 1229a(a)(3). In full proceedings, a noncitizen is charged with grounds of inadmissibility or removability and, even if found inadmissible or removable, can

[1] Pursuant to Local Rule 7.01(a)(1), counsel conferred with counsel for Defendants, and Defendants indicated that they oppose the motion.

seek certain forms of relief from removal, such as humanitarian protections or protections for special populations such as children and victims of crimes and trafficking.[2]

If an Immigration Judge finds a noncitizen inadmissible or removable and does not grant relief from removal, they can issue a removal order. 8 U.S.C. § 1101(a)(47)(A). This removal order becomes final when the Board of Immigration Appeals affirms it or the period to appeal lapses. *Id.* § 1101(a)(47)(B).

Congress has extensively regulated noncitizens with final removal orders. 8 U.S.C. § 1231, which addresses "[d]etention and removal of aliens ordered removed," provides for a 90-day "removal period" and that "[d]uring the removal period, the Attorney General shall detain the alien." *Id.* § 1231(a)(1)(A), (2)(A). The statute further provides that "[i]f the alien does not leave or is not removed within the removal period, the alien, pending removal, shall be subject to supervision . . ." including "periodic[]" check-ins with immigration officers for those released from custody. *Id.* § 1231(a)(3). It also addresses, *inter alia*, the country to which a noncitizen is to be removed. *See id.* § 1231(b); *Jama v. ICE*, 543 U.S. 335, 341 (2005) (describing these regulations).

As Congress has set forth, "final" removal orders are not necessarily conclusive. If a noncitizen petitions for review in a federal court of appeals, the court may reverse the order. 8 U.S.C. § 1252. Even after judicial review is exhausted, the existence of a final removal order does not necessarily mean the noncitizen will in fact be removed. A noncitizen may move the Executive Branch to reopen or reconsider a final order of removal for a number of reasons, like if a noncitizen

[2] Congress established several different forms of removal proceedings, including full removal proceedings with trial-like processes subject to administrative and judicial appeals, 8 U.S.C. § 1229a, expedited removal proceedings, a shortened form of proceedings for noncitizens who have recently entered the country, *id.* § 1225(b)(1), and reinstatement of removal proceedings, a shortened form of proceedings for noncitizens who unlawfully reenter the United States after a prior deportation, *id.* § 1231(a)(5).

did not receive a hearing notice and was ordered removed *in absentia*, or if there is new evidence of danger in the country of removal, or if the noncitizen has become newly eligible for immigration relief. *Id.* §§ 1229a(b)(5), (c)(6), (7).

Likewise, some individuals with final removal orders are nevertheless protected from removal to particular countries through withholding of removal and relief under the Convention Against Torture, 8 U.S.C. § 1231(b)(3)(A) and Note. Many people live and work in the United States indefinitely with both a final order of removal and such humanitarian protections. *See, e.g.*, *Nasrallah v. Barr*, 590 U.S. 573, 577 (2020) (noncitizen had been ordered removed but granted relief under the Convention Against Torture, blocking his removal); *see also* 8 C.F.R. § 274a.12(a)(10) (employment authorized for noncitizens granted withholding of removal).

Congress has also permitted noncitizens with final orders of removal to apply for various forms of immigration relief, including status for unaccompanied children, 8 U.S.C. § 1101(a)(27)(J); and for certain victims of crime, trafficking, and domestic violence, *id.* §§ 1101(a)(15)(U), (T), 1182(a)(6)(A)(ii), (d)(13), (14). These processes can lead to permanent immigration status, s*ee id.* § 1255, as well as interim benefits pending adjudication of applications for immigration relief including work authorization and deferred action. *See, e.g.*, *id.* § 1184(p)(6).

Qualifying noncitizens may also apply for various forms of discretionary protection from removal, such as Deferred Action for Childhood Arrivals ("DACA"), Deferred Enforced Departure ("DED"), or Temporary Protected Status ("TPS"). *Id.* § 1254a; *see also* 8 C.F.R. § 241.6(a) (authorizing DHS to "grant a stay of removal or deportation" to "an alien under final order" "for such time and under such conditions as [the agency] may deem appropriate"); Ben Harrington, Cong. Rsch Serv., R45158, *An Overview of Discretionary Reprieves from Removal: Deferred Action, DACA, TPS, and Others* (Apr. 10, 2018).

More generally, Congress has provided federal officials with extensive discretion throughout the removal process. Indeed, a "principal feature of the removal system is the broad discretion exercised by immigration officials." *Arizona*, 567 U.S. at 396; *see also Reno v. AADC*, 525 U.S. 471, 484-86 (1999). Federal officials "decide whether it makes sense to pursue removal at all." *Arizona*, 567 U.S. at 396. And "[a]t each stage" "in the deportation process," federal officials have "the discretion to abandon the endeavor." *AADC*, 525 U.S. at 483, 486. To start, federal officials choose among the several removal processes Congress established. *See Biden v. Texas*, 597 U.S. 785, 792-93 (2022). Once removal procedures have been initiated, federal officials decide whether to extend relief to otherwise removable noncitizens. *See, e.g.*, *INS v. Yueh-Shaio Yang*, 519 U.S. 26, 30 (1996).

Critically, once a final removal order has been issued, federal officials "may . . . decline to execute a final order of deportation." *See AADC*, 525 U.S. at 484. Federal officials may exercise this discretion "for humanitarian reasons or simply for [their] own convenience." *Id.* They may prioritize some removals, such as of noncitizens with serious criminal convictions, while deprioritizing others. For instance, there may be "some [noncitizens] (for instance, a veteran, college student, or someone assisting with a criminal investigation) who federal officials determine should not be removed." *Arizona*, 567 U.S. at 408. As a result of these choices, many noncitizens with final removal orders may remain in the country for extended periods, or indefinitely.

In addition to this civil removal system, Congress has also regulated removal in the criminal context. For example, Congress has made it a crime for certain noncitizens with removal orders to reenter the United States. 8 U.S.C. § 1326. Congress has also made it a crime for certain noncitizens with removal orders to fail to depart the United States. *Id.* § 1253. As with the civil

system, Congress placed all discretion to prosecute these crimes in the hands of federal officials. *See Iowa*, 157 F.4th at 924.

**B. Tennessee Enacts H.B. 1704 to Regulate Removal.**

H.B. 1704 is a blatant attempt to regulate removal and supersede the complex federal system that governs it.[3] As relevant here, Section 1 makes it a state crime for "an alien against whom a valid final order of removal is outstanding by reason of being a member of any of the classes described in 8 U.S.C. § 1227(a)" to "intentionally fail[] or refuse[] to depart from" Tennessee within 90 days from the date of the final order of removal under administrative processes or judicial review. H.B. 1704 § 1.[4]

Tennessee's new failure to depart crime is a Class A misdemeanor, which carries a maximum sentence of 11 months and 29 days in jail and a maximum fine of $2,500. H.B. 1704 § 1(b); Tenn. Code Ann. § 40-35-111(e)(1). Section 1 provides that, if the person "has not exhausted all available paths under federal law for challenging the final order of removal," the

[3] In addition to the failure to depart crime that is the subject of the instant lawsuit, H.B. 1704 also makes it a crime for certain noncitizens with removal orders or who departed while such an order was outstanding to reenter Tennessee. H.B. 1704 § 2. Various courts around the country have enjoined similar laws. *See, e.g.*, *Iowa*, 157 F.4th at 912 (affirming injunction against illegal reentry law); *Padres Unidos de Tulsa*, 785 F. Supp. 3d at 999-1000 (granting injunction against illegal entry and reentry law); *IORC*, 780 F. Supp. 3d at 1029 (same); *Fla. Immigrant Coal.*, 780 F. Supp. 3d at 1250-51 (same); *see also FLIC*, 2025 WL 1625385, at *1 (denying stay of injunction against illegal reentry law); *Uthmeier*, 145 S. Ct. at 2872 (same). This crime does not take effect until 30 days after the issuance of a hypothetical U.S. Supreme Court decision overturning *Arizona v. United States*, 567 U.S. 387 (2012), or adoption of a hypothetical federal statute that "removes the preemption of states' ability to determine that a person is unlawfully present in th[e] state." H.B. 1704 § 3. Plaintiffs do not challenge H.B. 1704 § 2 in this litigation.

[4] Section 1227(a), referenced in H.B.1704, describes noncitizens "in and admitted to the United States" who fall within various "classes of deportable [noncitizens]." 8 U.S.C. § 1227(a)." While this language refers to noncitizens who have been "admitted" to the United States, at least one court has read similar language to also apply to noncitizens who have not been admitted, such as those who entered the country without inspection. *See United States v. Doe*, 137 F.4th 1277 (11th Cir. 2025).

court "shall grant a stay of the criminal proceedings" until the person has exhausted those available paths. H.B. 1704 § 1(c). However, H.B. 1704 does not provide any affirmative defenses, including for noncitizens who are in the process of seeking or who have received federal immigration relief.

## STANDARD OF REVIEW

In determining whether a preliminary injunction should issue, a district court should consider "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction." *Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 760 (6th Cir. 2005).

## ARGUMENT

### I. PLAINTIFFS HAVE STANDING.

As a threshold matter, Plaintiffs have standing to challenge Section 1 of H.B. 1704. Courts around the country have held that similar plaintiffs have standing to raise pre-enforcement challenges to similar state immigration laws. *See Iowa*, 157 F.4th at 914-16; *Padres Unidos de Tulsa v. Drummond*, 783 F. Supp. 3d 1324, 1340-45 (W.D. Okla. 2025); *IORC*, 780 F. Supp. 3d at 1031-38; *Fla. Immigrant Coal.*, 780 F. Supp. 3d at 1253.

Plaintiffs Lucy and Benjamin have an injury-in-fact because (1) they have "an intent 'to engage in a course of conduct' arguably 'affected with a constitutional interest,'" (2) their intended future conduct is "arguably 'proscribed by a statute,'" and (3) "there is 'a credible threat' of the statute's enforcement." *Christian Healthcare Ctrs., Inc. v. Nessel*, 117 F.4th 826, 843 (6th Cir. 2024) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014)).[5]

[5] Plaintiffs are contemporaneously filing a motion for leave to proceed under these pseudonyms.

Plaintiffs satisfy all three prongs. First, they have a "federal right to be free from" impermissible state regulation. *Murphy v. NCAA*, 584 U.S. 453, 479 (2018). Thus, their "[c]onduct is arguably affected with a constitutional interest by virtue of its federal preemption claim, which is 'basically constitutional in nature' because it 'deriv[es] its force from the operation of the Supremacy Clause.'" *McKee Foods Corp. v. BFP Inc.*, 173 F.4th 242, 258 (6th Cir. 2026) (quoting *Douglas v. Seacoast Prods., Inc.*, 431 U.S. 265, 271-72 (1977)).

Second, Plaintiffs' conduct is forbidden. *Kentucky v. Yellen*, 54 F.4th 325, 337 (6th Cir. 2022). Both Lucy and Benjamin fall within the plain text of H.B. 1704: they live in Tennessee and have final orders of removal after exhausting all available paths for challenging them. Lucy Decl ¶¶ 3, 7; Benjamin Decl. ¶¶ 3, 6; H.B. 1704 § 1. Thus, Plaintiffs "intend[] to engage[] in [] conduct" that falls squarely within the failure to depart provision and is "proscribed by [H.B. 1704]." *McKey Foods Corp.*, 173 F.4th at 258.

Finally, Plaintiffs face a credible threat of enforcement because state officials "have not disavowed enforcement" and the "[s]tatute contains no potential for exemptions." *Yoder v. Bowen*, 146 F.4th 516, 525 (6th Cir. 2025); *see also Kareem v. Cuyahoga Cnty. Bd. of Elections*, 95 F.4th 1019, 1027 (6th Cir. 2024) (finding a credible threat of enforcement where, *inter alia*, plaintiff faced imprisonment for violating the statute at issue and defendant did not disavow enforcement).[6]

---

[6] In addition to standing, Plaintiffs have a cause of action to sue under the longstanding equitable practice reflected in *Ex Parte Young*, 209 U.S. 123 (1908), which makes clear that plaintiffs threatened with preempted prosecutions can sue in equity. *See Armstrong v. Exceptional Child Center*, 575 U.S. 320, 327 (2015) (reaffirming such traditional "power of federal courts of equity"); *McKee Foods Corp.*, 173 F.4th at 257. And courts have expressly recognized that equitable relief is available to enjoin preempted state immigration laws. *See Ga. Latino All. for Hum. Rts. v. Governor of Ga.*, 691 F.3d 1250, 1261-62 (11th Cir. 2012) ("*GLAHR*"); *Iowa*, 157 F.4th, at 918; *Farmworker Ass'n of Fla. v. Uthmeier*, 792 F. Supp. 3d 1306, 1325-31 (S.D. Fla. Mar. 11, 2025); *IORC*, 780 F. Supp. 3d at 1032.

Plaintiffs thus have standing to pursue their pre-enforcement challenge to H.B. 1704 because they are subject to prosecution under the statute.

## II. H. B. 1704 IS PREEMPTED.

H.B. 1704 is preempted. It regulates removal, an exclusively federal field. H.B. 1704 also conflicts with federal law in numerous ways, including by overriding federal discretion over the execution of removal orders.

### A. H.B. 1704 Intrudes on the Exclusively Federal Field of Removal.

H.B. 1704 creates a state immigration crime that is a direct intrusion into the quintessentially federal field of removal. The Supreme Court, the Sixth Circuit, and other courts have long recognized the dominant federal interest in removal and the pervasiveness of Congress's scheme regulating it. *See, e.g.*, *Fong Yue Ting v. United States*, 149 U.S. 698, 711-12 (1893); *Arizona v. Biden*, 40 F.4th 375, 386-87 (6th Cir. 2022); *United States v. Alabama*, 691 F.3d 1269, 1293 (11th Cir. 2012); *FLIC*, 2025 WL 1625385, at *3; *Padres Unidos de Tulsa*, 785 F. Supp. 3d at 1000; *IORC*, 780 F. Supp. 3d at 1041; *Fla. Immigrant Coal.*, 780 F. Supp. 3d at 1258-59. H.B. 1704—which directly regulates in the field of removal—is field preempted.

Courts may infer field preemption from either a "federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject," or "a framework of regulation 'so pervasive . . . that Congress left no room for the States to supplement it.'" *Arizona*, 567 U.S. at 399 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). Both tests are satisfied here.

The federal interest in removal is unquestionably dominant. As the Supreme Court has long recognized, the federal government's ability to "exclude or to expel" noncitizens is "an inherent and inalienable right of every sovereign and independent nation." *Fong Yue Ting*, 149 U.S. at 711;

*see id.* at 714 ("Congress . . . ha[s] the right . . . to expel aliens . . . or to permit them to remain"). But states, by contrast, are not endowed with such "powers of external sovereignty." *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 316-18 (1936). Thus, it is well-established that "the removal process is entrusted to the discretion of the Federal Government." *Arizona*, 567 U.S. at 409; *see Hines v. Davidowitz*, 312 U.S. 52, 62 & n.10 (1941) (noting "the supremacy of the national power . . . over. . . deportation").

The Sixth Circuit and other federal courts have also recognized the dominant federal interest in removal. The Sixth Circuit has explained that "[t]he key sovereign with authority and 'solicitude' with respect to immigration is the National Government, not the states." *Arizona v. Biden*, 40 F.4th 375, 386-87 (6th Cir. 2022). Accordingly, the states do not have "the authority to exclude individuals" or "to prevent people from entering or leaving their territory." *Id.* at 387. Other circuits have concluded the same. *See Lozano v. City of Hazleton*, 724 F.3d 297, 315-16 (3d Cir. 2013) ("The INA's comprehensive scheme plainly precludes state efforts, whether harmonious or conflicting, to regulate residence in this country based on immigration status.") (citation modified); *Alabama*, 691 F.3d at 1293 ("The power to expel aliens has long been recognized as an exclusively federal power.").

Consistent with this dominant federal interest, Congress has established a highly "pervasive" regime to govern removal from the United States. *Arizona*, 567 U.S. at 399 (internal quotation marks omitted); *see also Alabama*, 691 F.3d at 1294 (discussing "Congress's comprehensive statutory framework governing alien removal"). Through the INA, Congress has enacted an exceptionally detailed, complex, and finely reticulated regulatory framework governing the removal of noncitizens. *See, e.g.*, 8 U.S.C. §§ 1225, 1227, 1229a, 1229b, 1229c, 1231. Congress established multiple forms of removal proceedings, *id.* § 1229a (full removal

proceedings), *id.* § 1225(b)(1) (expedited removal), *id.* § 1231(a)(5) (reinstatement of removal), and provided that they shall be "the sole and exclusive procedure" for determining whether a noncitizen may be removed. *Id.* § 1229a(a)(3).

Indeed, Congress has extensively regulated the presence, detention, status, and possible punishment of noncitizens with final orders of removal—the same population that Tennessee seeks to regulate here. 8 U.S.C. § 1231, which governs "[d]etention and removal of aliens ordered removed," includes an extremely detailed set of regulations that set forth, among other things, the time period for removal, detention rules for people with removal orders, supervision of people with removal orders, and countries to which a person can be removed. *See* 8 U.S.C. § 1231(a)(1)-(3), (b)(1)-(3); *Jama*, 543 U.S. at 341. Congress has also provided a detailed process by which noncitizens can petition for federal court review of their removal order. *See* 8 U.S.C. § 1252(a)(1). As explained above, *supra* Section A, Congress has also provided for removal orders to be reopened even after they are final, and numerous forms of relief from removal that are specifically available to noncitizens with final orders of removal. Congress has further provided that a noncitizen's order of removal shall be reinstated through a special procedure, 8 U.S.C. § 1231(a)(5), and Congress has criminally regulated noncitizens with final removal orders, 8 U.S.C. §§ 1253, 1326. Finally, Congress has provided federal immigration officials with "broad discretion" in executing removal orders, which is a "principal feature of the removal system." *Arizona*, 567 U.S. at 396; *see infra* Section I.B.

Through these many intricate and interrelated provisions, Congress has established "a full set of standards governing" removal, which is "designed as a 'harmonious whole.'" *Arizona*, 567 U.S. at 401 (quoting *Hines*, 312 U.S. at 72). Because the field of removal is preempted, "States

may not enter" this field "in any respect," and "even complementary state regulation is impermissible." *Id.* at 401-02.

Through H.B. 1704, however, Tennessee has entered this preempted field. It expressly predicates a state crime on conduct related to a federal removal order, going to so far as to explicitly refer to 8 U.S.C. § 1227, a federal statute regarding removal. It requires noncitizens to "depart from this state" under threat of criminal enforcement. H.B. 1704 § 1. And it specifically regulates the same population that Congress has extensively regulated in the INA—noncitizens with final removal orders—with respect to the same subject matter: their presence, status, and punishment. H.B. 1704 represents an extraordinary intrusion on the field of removal.

Defendants may argue that H.B. 1704 is permissible because it does not criminalize failure to depart from the United States—only Tennessee. But it does attach a state law criminal penalty to federal removal orders, intruding into the field of removal. *Any* regulation in the field of removal is prohibited, because "[s]tates may not enter" a preempted field "in *any* respect." *See Arizona*, 567 U.S. at 401-02 (emphasis added); *see also Hines*, 312 U.S. at 59-69 (state law solely concerned with registration of noncitizens in Pennsylvania was nonetheless preempted by comprehensive federal scheme). Courts have accordingly held that a state's attempts to "unilaterally determine" that certain noncitizens "cannot live within the state's territory" are preempted. *Alabama*, 691 F.3d at 1295; *see also GLAHR*, 691 F.3d at 1264 (similar).

Moreover, H.B. 1704 criminalizes noncitizens' presence in Tennessee, effectively expelling them from the State of Tennessee—where Plaintiffs live. That is why even state laws that indirectly regulate removal are preempted. *See, e.g.*, *Lozano*, 724 F.3d at 315-18 (preempted municipal housing regulations were "thinly veiled attempt to regulate residency" even though they did not "control actual . . . expulsion from [the City] or the United States"); *Alabama*, 691 F.3d at

1294-95 (state law limits on noncitizens' ability to enter into contract were "preempted by the inherent power of the federal government to regulate immigration"). Far from implicit, H.B. 1704 directly regulates removal and is an even greater intrusion into the federal scheme because it requires noncitizens to leave their homes, their communities, and the state, or to face criminal penalties.

Regulating removal is for the federal government, not the states. In a preempted field such as this one, "even complementary state regulation is impermissible." *Arizona*, 567 U.S. at 401-02. For example, in *Arizona*, the Supreme Court invalidated Section 3 of Arizona's law, which criminalized failure to carry a federal noncitizen registration form. Although Section 3 mirrored and even incorporated federal law, the Supreme Court held that Congress had already occupied the field of noncitizen registration, which implicated the federal government's external sovereign authority. *Id.* at 400-03. All the reasons the Supreme Court gave for finding Section 3 of the Arizona statute field preempted apply with equal force to the field of removal, which is more uniquely federal than registration, as it lies at the very core of Congress's sovereign immigration powers. *See, e.g.*, *Fong Yue Ting*, 149 U.S. at 711

Following the teachings of *Arizona*, several courts have found field preempted state criminal laws that mirrored federal immigration crimes. *See, e.g.*, *FLIC*, 2025 WL 1625385, at *3 (denying stay of injunction against state illegal entry and reentry law on field preemption grounds); *Padres Unidos de Tulsa*, 783 F. Supp. 3d at 1345-47 (finding state illegal entry and reentry crimes that mirrored federal law to be field preempted); *Fla. Immigrant Coal.*, 780 F. Supp. 3d at 1258-62 (similar); *see also IORC*, 780 F. Supp. 3d at 1039-43 (analyzing law under field and conflict preemption principles).

And for good reason: as the Supreme Court observed in *Arizona*, if a state law that regulated removal "were valid, every State could give itself independent authority to prosecute federal violations, diminishing the Federal Government's control over enforcement[,] . . . detracting from the integrated scheme of regulation created by Congress," and allowing prosecution "even in circumstances where federal officials in charge of the comprehensive scheme determine that prosecution would frustrate federal policies." *Arizona*, 567 U.S. at 402 (citations omitted); *see also GLAHR*, 691 F.3d at 1264 (similar). Indeed, if one state could decide to expel these noncitizens from its borders, so could any other state—leading to a patchwork of regulation that would undermine Congress's comprehensive federal scheme. And this concern is far from hypothetical—over the past three years, nine states have adopted their own regulations of entry and removal, which courts around the country have held preempted. *See, e.g.*, *Iowa*, 157 F.4th at 920-24; *FLIC*, 2025 WL 1625385, at *3; *Padres Unidos de Tulsa*, 783 F. Supp. 3d at 1345-47; *IORC*, 780 F. Supp. 3d at 1039-43; *Fla. Immigrant Coal.*, 780 F. Supp. 3d at 1258-62. H.B. 1704 is similarly preempted.

**B. H.B. 1704 Conflicts with the Removal System.**

In addition, H.B. 1704 is conflict preempted because it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in multiple respects. *Arizona*, 567 U.S. at 399 (quoting *Hines,* 312 U.S. at 67).

*First*, H.B. 1704 obstructs federal law by wresting the "broad discretion" Congress entrusted to federal officials over removal decisions and giving it to the state. *Arizona*, 567 U.S. at 396; *see Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000) (state sanctions law preempted where it was "obstacle to the accomplishment of Congress's full objectives under the federal [statute]," including "its delegation of effective discretion to the President").

As explained above, *supra* Section A, "[a] principal feature of the removal system is the broad discretion exercised by immigration officials." *Arizona*, 567 U.S. at 396. In particular, federal officials "decide whether it makes sense to pursue removal at all." *Id.* And, as is especially relevant here, federal officials decide whether and when to execute final removal orders. A noncitizen with a final removal order may move the Executive to reopen or reconsider the order and may apply for various forms of relief from removal. Federal officials have discretion to grant these requests or simply to decline to execute the final removal order. "[E]xecuting removal orders" is "prosecution of [a] stage [] in the deportation process" and "[a]t each stage the Executive has discretion to abandon the endeavor." *AADC*, 525 U.S. at 483; *see also Nken v. Holder*, 556 U.S. 418, 439-40 (2009) (Alito, J., dissenting) ("Once an order of removal has become final, it may be executed at any time"—but "the Executive Branch" may still "stay its own hand"). Federal officials may also grant deferred action, whereby they formally decline to carry out a removal. *AADC*, 525 U.S. at 484. And federal officials may also decide when to employ criminal penalties for failing to depart the United States. *See* 8 U.S.C. § 1253.

In other words, Congress has vested federal officials with a wide range of tools so they can balance various policy and humanitarian concerns and decide whether removal best serves the national interest. *See Iowa*, 157 F.4th at 921-22 (collecting cases). Their exercise of this discretion "implicates not only normal domestic law enforcement priorities but also foreign-policy objectives." *Texas*, 599 U.S. at 679 (cleaned up); *see also Jama*, 543 U.S. at 348 ("Removal decisions . . . may implicate our relations with foreign powers and require consideration of changing political and economic circumstances") (citation modified); *Arizona*, 567 U.S. at 409 (similar). "Returning an alien to his own country may be deemed inappropriate," even where he is removable, if, for example, "[t]he foreign state [is] mired in civil war, complicit in political

persecution, or enduring conditions that create a real risk that the alien or his family will be harmed upon return." *Arizona*, 567 U.S. at 396-97. "Discretion in the enforcement of immigration law [also] embraces immediate human concerns," *id.* at 396, and federal officials may exercise their discretion "for humanitarian reasons or simply for [their] own convenience," *AADC*, 525 U.S. at 484. *See, e.g.*, Department of Homeland Security Appropriations Act 2010, Pub. L. No. 111–83, 123 Stat. 2142, 2149 (2009) (requiring the Secretary of Homeland Security to "prioritize the identification and removal of aliens convicted of a crime by the severity of that crime").

Balancing these competing priorities, federal officials prioritize the removal of some noncitizens while allowing other noncitizens with final removal orders to remain in the country. In exercising the discretion Congress has vested in them, federal officials employ civil tools, such as civil detention and deportation and alternatives to detention such as check ins with federal officers, as well as criminal tools, such as 8 U.S.C. § 1253. Federal officials use these tools to advance their strategic goals; for example, in the case of a noncitizen whose removal raises humanitarian concerns, federal officials might allow the noncitizen to remain in the country and check in with federal officers but not criminally charge the noncitizen with failing to depart the country. *See* 8 U.S.C. § 1231(a)(3) (noting that noncitizens who remain in the country after the 90-day removal period may be released from custody on supervision and subject to periodic check-ins). These tools allow the federal government to balance complex and interrelated domestic and international policies and priorities, and Congress made clear that those choices must remain exclusively federal. *See Arizona*, 567 U.S. at 408; *Iowa*, 157 F.4th at 919-23; *Texas*, 599 U.S. at 679.

H.B. 1704 runs roughshod over this federal discretion because it requires noncitizens with final removal orders to immediately depart the state or face criminal punishment. This requirement

is in clear conflict with Congress's specific decision to allow noncitizens with final removal orders to seek certain forms of relief, as well as Congress's decision to allow federal officials to exercise their discretion and permit noncitizens with final removal orders to remain. *See Arizona*, 567 U.S. at 396-97, 407-09 (citing these as reasons why unilateral state action is preempted); *Iowa*, 157 F.4th at 921-24 (same); *Alabama*, 691 F.3d at 1295 (statute conflict preempted where state had "unilaterally determine[d] that any alien unlawfully present in the United States cannot live within the state's territory"); *United States v. South Carolina*, 720 F.3d 518, 531-32 (4th Cir. 2013) (provisions preempted where they "improperly place in the hands of state officials the nation's immigration policy, and strip federal officials of the authority and discretion necessary in managing foreign affairs"); *GLAHR*, 691 F.3d at 1265 (similar, emphasizing discretion of federal prosecutors over immigration crimes). H.B. 1704 "empowers [Tennessee] to contradict the policy decisions of Congress, and the policy decisions made with the discretion that Congress grants to federal immigration officials, frustrating U.S. law enforcement and foreign policy interests." *Iowa*, 157 F.4th at 923.

For example, in Benjamin's case, the federal government has exercised its discretion by granting him deferred action through DACA, which permits people like Benjamin, who were brought to this country as children, to remain here in order to avoid the harsh result of their removal. Benjamin Decl. ¶ 6. But H.B. 1704 would upend this federal discretion, forcing Benjamin to leave his home of two decades because of a removal order the federal government has chosen not to execute at this time. Or consider the case of Lucy, who is at risk of prosecution under H.B. 1704 even though she has a pending application for federal immigration relief under the Violence Against Women Act (VAWA)—which Congress explicitly permits noncitizens with final removal orders to seek—and has been instructed to check in with federal officials every month in Memphis.

Lucy Decl. ¶¶ 8-9. Under H.B. 1704, Lucy faces conflicting instructions from federal and state officials. Federal officials have directed her to check in with them in Memphis, while H.B. 1704 requires Lucy to leave Memphis under threat of criminal punishment. These conflicts exemplify the broader problem: by purporting to transfer discretion from federal to state hands, H.B. 1704 disrupts Congress's scheme, in which federal officials decide whether, when, and how to enforce or execute removal orders.

*Second*, and relatedly, H.B. 1704 allows Tennessee to unilaterally enforce immigration law. H.B. 1704 violates Arizona's core teaching that states cannot act unilaterally to regulate immigration "without any input from the Federal Government." *Arizona*, 567 U.S. at 408. Letting Tennessee unilaterally arrest, detain, and prosecute noncitizens with removal orders for failing to depart would allow it to "achieve its own immigration policy," *id.*—a result that Arizona repeatedly rejects. Section 6 of the challenged Arizona law allowed state officers to make warrantless arrests of noncitizens who were possibly removable. The Court held that the provision was preempted because it allowed "unilateral state action" that disregarded the "significant complexities involved in enforcing federal immigration law" and usurped the federal government's ability to exercise discretion and weigh competing humanitarian, foreign policy, and other considerations. *Id.* at 407-10. Section 3—the registration scheme discussed above—was similarly preempted because (among other things) it allowed unilateral state prosecutions for what were effectively violations of federal law. States cannot independently arrest, detain, and prosecute individuals for alleged violations of federal law "without any input from the Federal Government." *Id.* at 408. The Court explained that providing states with "independent authority to prosecute" would upend the "careful framework Congress adopted," "diminish the Federal Government's control over enforcement," and "frustrate federal policies." *Id.* at 402 (cleaned up). And even with

regard to Section 2(B), which the Court upheld because it could be read to merely authorize communication with federal authorities, the Court explained that "it would disrupt the federal framework" to allow state detention "for possible unlawful presence without federal direction and supervision." *Id.* at 413. Thus, the through line of the entire *Arizona* decision is that federal law does not allow "unilateral state action" in the field of immigration enforcement. *Id.* at 410. And if unilateral arrests alone were enough for preemption of Section 6 in *Arizona*, then unilateral arrests, detention, and prosecution under H.B. 1704 must be preempted as well.

Defendant may argue that H.B. 1704 does not conflict with federal law because it tracks some of the language in 8 U.S.C. § 1253. That may be true in other contexts, "[b]ut not here." *Iowa*, 157 F.4th at 922 (rejecting this argument). As in *Crosby*, "Congress clearly intended the federal Act to provide the [Executive] with flexible and effective authority." 530 U.S. at 374. And, just as in that case, Tennessee's "unyielding application" of criminal sanctions whenever it sees fit "undermines the [executive's] intended statutory authority by making it impossible" for the federal executive to chart the course it thinks best in particular circumstances. *Id.* at 377; *see Arizona*, 567 U.S. at 396–97, 408.

In sum, in H.B. 1704, Tennessee has asserted "state authority could be exercised without any input from the Federal Government about whether [removal] is warranted in a particular case," which "would allow the State to achieve its own immigration policy" and target noncitizens "who federal officials determine should not be removed." *Arizona*, 567 U.S. at 408. A state cannot simply expel people from its borders. "[Tennessee] has taken it upon itself to unilaterally determine that any alien [with a final removal order] cannot live within the state's territory, regardless of whether the Executive Branch would exercise its discretion to permit the alien's presence. This is

not a decision for [Tennessee] to make." *Alabama*, 691 F.3d at 1295. H.B. 1704 is conflict preempted.

## III. THE EQUITIES STRONGLY FAVOR AN INJUNCTION.

### A. H.B. 1704 Will Irreparably Harm Plaintiffs Absent Injunctive Relief.

Absent an injunction, Plaintiffs and members of the putative class will suffer irreparable harm by being placed at immediate risk of arrest, detention, and prosecution under a state statute that is preempted by federal law. It is well established that "the threat of criminal prosecution" under a preempted state law "constitutes irreparable harm for purposes of a preliminary injunction." *Farmworker Ass'n of Fla., Inc. v. Moody*, 734 F. Supp. 3d 1311, 1338 (S.D. Fla. 2024) (collecting cases).

Lucy has lived in Memphis, Tennessee for the past 25 years. Lucy Decl. ¶ 11. She has a final removal order from decades ago but regularly checks in with federal officers and has done so for many years. *Id.* ¶¶ 7-8. She has also applied for relief from removal under VAWA, which would put her on a pathway to lawful permanent residence. *Id.* ¶ 9. Lucy's entire life and community—her sons, including one United States citizen son who is starting college and whom she financially supports, her job, where she has worked for 25 years, and her doctors and immigration lawyer—is located in Memphis. *Id.* ¶¶ 11-14. Benjamin, who lives in Memphis, also has a decades-old final removal order; he was an early recipient of DACA and still has it today. Benjamin Decl. ¶¶ 3-6. His life, including an intensive training program for a federal license, is also located in the Memphis area. *Id.* ¶ 7.

Both Lucy and Benjamin face arrest, detention, and prosecution under H.B. 1704, or leaving the state that they have called home for decades, and where their family, loved ones, and communities reside. Lucy Decl ¶¶ 10-14; Benjamin Decl. ¶¶ 8-9; *see Farmworker Ass'n of Fla.,*

*Inc.*, 734 F. Supp. 3d at 1339 (finding that separation from families constitutes irreparable harm). The threatened enforcement of this law against Plaintiffs constitutes irreparable injury. *See Iowa*, 157 F.4th at 927 (threat of prosecution under state immigration law constituted irreparable injury); *GLAHR*, 691 F.3d at 1269 (similar); *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) (similar).

**B. The Balance of Equities and Public Interest Support an Injunction.**

Any interest the State has in enforcement of H.B. 1704 is far outweighed by the harms to Plaintiffs, the putative class, and the public. "Federal officials of course already enforce immigration law—and many [Tennessee] law-enforcement agencies have entered into agreements with the Department of Homeland Security that allow local police to enforce federal immigration law." *FLIC*, 2025 WL 1625385, at *6. The availability of such cooperation with the federal government thus "ameliorates [Defendants'] concern." *Iowa*, 157 F.4th at 929. Moreover, the "[f]rustration of federal statutes and prerogatives [is] not in the public interest." *Alabama*, 691 F.3d at 1301. Nor is "perpetuat[ing] the unconstitutional application of a statute." *Martin-Marietta Corp. v. Bendix Corp.*, 690 F.2d 558, 568 (6th Cir. 1982).

On the other side of the ledger, the harms to Plaintiffs and the putative class—who must leave their homes, lives, and families in Tennessee or else face arrest and prosecution—are significant. Plaintiffs and the putative class face arrest, prosecution, and separation from their families—which will significantly harm them and their communities. Even those who are not subject to H.B. 1704 will reasonably fear being targeted and racially profiled. *See Ortega-Melendres v. Arpaio*, 836 F. Supp. 2d 959, 979-980 (D. Ariz. 2011). H.B. 1704 risks eroding the public trust that governments have worked to create with migrant communities and that is integral to public safety. *See Make the Road New York v. Pompeo*, 475 F. Supp. 3d 232, 270 (S.D.N.Y.

2020) (enjoining public charge rule because of chilling effect the rule had on immigrants seeking services). In sum, the equities weigh heavily in favor of a preliminary injunction.

## IV. THE COURT SHOULD REQUIRE ONLY NOMINAL SECURITY

Fed. R. Civ. P. 65(c) provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damage sustained by any party found to have been wrongfully enjoined or restrained." However, courts repeatedly exercise broad discretion to determine the appropriate amount of an injunction bond and whether to waive it. *Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995). District courts exercise this discretion to require no security in cases brought by indigent individuals, or nominal bond when the court considers it appropriate. *Disability Rights Ohio v. Buckeye Ranch, Inc.*, 375 F. Supp. 3d 873, 898 (S.D. Ohio 2019); *Am. Sys. Consulting, Inc. v. Devier*, 514 F. Supp. 2d 1001, 1010 (S.D. Ohio 2007) (finding that bond was not warranted after an equitable analysis). This Court should order Plaintiffs to post nominal security in the amount of $1.00.

## CONCLUSION

The Court should grant a preliminary injunction enjoining enforcement of Section 1 of HB 1704. It should enjoin Defendants and their officers, agents, servants, employees, and attorneys, and all other persons who are in active concert or participation with them. Fed. R. Civ. P. 65(d)(2).

Dated: June 4, 2026

/s/ *Lucas Cameron-Vaughn*
Lucas Cameron-Vaughn (BPR# 036284)
Zee Scout (BPR# 042637)
ACLU Foundation of Tennessee
P.O. Box 120160
Nashville, Tennessee 37212
Tel: (615) 320-7260
lucas@aclu-tn.org
zscout@aclu-tn.org

Hannah Steinberg*
Cody Wofsy*
Oscar Sarabia Roman*
Spencer Amdur*
American Civil Liberties Union
Foundation Immigrants' Rights Project
425 California Street, 7th Floor
San Francisco, CA 94104
Tel: (415) 343-0770
hsteinberg@aclu.org
cwofsy@aclu.org
osarabia@aclu.org
samdur@aclu.org

Noor Zafar*
Grace Choi*
Omar Jadwat*
American Civil Liberties Union
Foundation Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2660
nzafar@aclu.org
gchoi@aclu.org
ojadwat@aclu.org

Peter McGraw*
Efrén Olivares*
Kevin Siegel*
National Immigration Law Center
1101 14th Street, Suite 410
Washington, D.C. 20005
Tel: (213) 639-3900
mcgraw@nilc.org
olivares@nilc.org
siegel@nilc.org

*Attorneys for Plaintiffs*
**Pro hac vice application forthcoming*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 4, 2026, I electronically filed the foregoing with the Clerk of Court by using the District Court CM/ECF system. I have also caused a copy to be emailed to the following attorneys with the Tennessee Attorney General's Office: Miranda Jones (Miranda.Jones@ag.tn.gov); David Wickenheiser (David.Wickenheiser@ag.tn.gov); Jessica Berk (Jessica.Berk@ag.tn.gov).

/s/ *Lucas Cameron-Vaughn*____________
Lucas Cameron-Vaughn