UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

|  |  |
|---|---|
| LUCY, BENJAMIN, on behalf of themselves and all others similarly situated, <br><br>      *Plaintiffs*, <br><br>  v. <br><br> JONATHAN SKRMETTI, in his official capacity as the Attorney General and Reporter for the State of Tennessee, et al., <br><br>      *Defendants*. | Case No. 3:26-cv-00763 |

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

i

H.B. 1704 is blatantly unconstitutional. Defendants attempt to escape this conclusion by ignoring the comprehensive federal framework governing removal, including the discretion provided to federal officials to decide whether and when to execute removal orders. *See Reno v. AADC*, 525 U.S. 471, 483-84 (1999). H.B. 1704 totally denies federal officials this discretion, allowing Tennessee to unilaterally regulate removal. Defendants attempt to sidestep the merits through threshold arguments, but those, too, are meritless. H.B. 1704 should be enjoined.

## I.      DEFENDANTS' THRESHOLD ARGUMENTS LACK MERIT.

1. Plaintiffs' conduct is "arguably proscribed" by H.B. 1704. *Friends of George's, Inc. v. Mulroy*, 108 F.4th 431, 437 (6th Cir. 2024). Both Lucy and Benjamin have valid final orders of removal, Lucy Decl. ¶ 7, Benjamin Decl. ¶¶ 5-6, and they intend to remain in Tennessee after the 90-day removal period—which elapsed long ago. Lucy Decl. ¶¶ 7, 11; Benjamin Decl. ¶¶ 2, 5, 7-9. "Thus, the express statutory language" of H.B. 1704 "clearly renders [the statute] applicable" to Plaintiffs and "provide[s] a basis for prosecution." *Planned Parenthood Ass'n of Cincinnati, Inc. v. City of Cincinnati*, 822 F.2d 1390, 1395 (6th Cir. 1987).

Defendants suggest that Plaintiffs were not ordered removed as members of the classes described in 8 U.S.C. § 1227(a). Opp. 9 (Dkt. 25). That misunderstands the federal removal scheme, under which individuals are charged with either being "deportable" under § 1227(a) if they were previously admitted to the United States, or "inadmissible" under 8 U.S.C. § 1182 if they were not. *See Judulang v. Holder*, 565 U.S. 42, 46 (2011). Once a noncitizen has been "admitted" on a visa, they must be charged as deportable under § 1227(a) for a removal order to issue. Those who are admitted on visas and issued removal orders hence fall into one of the categories in § 1227(a). And the record clearly reflects that Lucy and Benjamin were admitted on visas and were later ordered removed. *See* Lucy Decl. ¶ 6; Benjamin Decl. ¶ 4.

1

Defendants question the validity of Plaintiffs' removal orders and suggest that they may fall within a (nonexistent) exemption to H.B. 1704. Opp. 9. Both claims are baseless. Plaintiffs were ordered removed years ago, Lucy Decl. ¶ 7, Benjamin Decl. ¶¶ 5-6, and Defendants provide no reason to doubt that the orders are valid. Defendants further speculate that the orders may not be "outstanding" because, at some point in the future, Plaintiffs *might* obtain relief, *see* Opp. 10 (noting that "Lucy is actively seeking cancellation of her order"). But this does not undermine Plaintiffs' standing to obtain preliminary relief *now*, and H.B. 1704 contains no defense to prosecution for individuals who are pursuing federal relief.

Finally, contrary to Defendants' assertion, Opp. 10, Plaintiffs have already remained in Tennessee 90 days beyond the date they were ordered removed. Lucy's removal order became final in 2005, yet she has lived in Tennessee for 25 years and will continue to do so. Lucy Decl. ¶¶ 7, 11-14. Benjamin was ordered removed as a teenager, is now 35 years old, and intends to stay in Tennessee to complete his training program. Benjamin Decl. ¶¶ 2, 5, 7-10.

2. As for threat of prosecution, Defendants' cramped reading of *McKay v. Federspiel*, 823 F.3d 862 (6th Cir. 2016), would all but eliminate pre-enforcement standing and impose an impossibly high burden on plaintiffs that the Sixth Circuit has never endorsed.[1] Rather, the Sixth Circuit has explained that the *McKay* "factors are not exhaustive, nor must each be established." *Online Merchs. Guild v. Cameron*, 995 F.3d 540, 550 (6th Cir. 2021), *abrogated on other grounds as recognized by Tenn. Conf. of NAACP v. Goins*, 139 F.4th 557 (6th Cir. 2025). As previously explained, the circumstances here support the conclusion that the threat of

---

[1] Defendants argue that the *Ex parte Young* exception to sovereign immunity does not apply because they have not threatened to enforce H.B. 1704. This fails for the same reasons as their standing arguments. *See* Opp. 14 (conceding that standing and *Ex parte Young* are "coextensive" under circuit law); *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1047 (6th Cir. 2015).

enforcement is not "chimerical." *McKee Foods Corp. v. BFP Inc.*, 173 F.4th 242, 259 (6th Cir. 2026) (finding credible threat of enforcement where plaintiff brought preemption claim).

Regarding the first two factors, Defendants cite the lack of past enforcement and warning letters. Opp. 11. But because H.B. 1704 is not yet in effect, "the fact that no one has been prosecuted under the provision is unsurprising," *Universal Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021, 1035 (6th Cir. 2022); *see Welty v. Dunaway*, 791 F. Supp. 3d 818, 834 n.5 (M.D. Tenn. 2025) (collecting cases). For similar reasons, the second factor, the lack of warning letters, "carries little weight." *Dunaway*, 791 F. Supp. 3d at 835. Indeed, finding a lack of standing based solely on these first two factors would effectively bar pre-enforcement challenges and require plaintiffs to subject themselves to prosecution before they could sue. *Cf. MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29 (2007) ("[W]e do not require a plaintiff to expose himself to liability before bringing suit to challenge . . . the constitutionality of a law threatened to be enforced.").

On the third *McKay* factor, Defendants claim that H.B. 1704 is merely "a standard criminal law," Opp. 11, with no attributes making enforcement more likely. But in truth the statute is highly unusual, seeking to claim for Tennessee a power that has been understood to be exclusively federal for well over a century. Mot. 9-10. And it "contains no potential for exemptions that make the threat of enforcement remote," *Yoder v. Bowen*, 146 F.4th 516, 525 (6th Cir. 2025)—a point Defendants do not contest. Indeed, unlike many criminal laws, H.B. 1704 requires Plaintiffs to engage in no new conduct to be subject to arrest and prosecution—just continuing to live their everyday lives in Tennessee. These attributes make the threat of enforcement far from chimerical.

Finally, Defendants notably decline to disavow enforcement of the law—which tips the fourth *McKay* factor in Plaintiffs' favor. Opp. 11-12. To the contrary, Defendants plainly envision that it will be broadly enforced; indeed, their request for an injunction bond indicates they anticipate enforcement will result in potentially the entire class being removed from the State. Opp. 30 (seeking bond based on "costs associated with these individuals' presence in Tennessee"). Instead, they seek to heighten the standard beyond all recognition. Opp. 11 (contending Plaintiffs must "*ask*[] Defendants before this lawsuit how they will enforce ROCA against [them] and their specific circumstances"). Defendants cannot defeat standing by merely vaguely claiming they need "a full factual investigation," *id*., of any potential plaintiff. Although some cases may "focus[]" on disavowal of enforcement in the circumstances of particular individuals, Opp. 11, here the question is whether Defendants have "clearly disavowed enforcement" against the "*conduct*" at issue here—namely, continuing to live in Tennessee with a final removal order. *Yoder*, 146 F.4th at 525 (emphasis added) (agency's position on relevant type of "conduct" controlled, even without "individual[]" threats). They have not.

Of course, even if such a disavowal came, it "must be more than a mere litigation position." *Id*. (internal quotation marks omitted). But Defendants have refused even that. They suggest they need more information about the "scope and nature of [Plaintiffs'] cooperation with the federal government," Opp. 12, but of course a police officer encountering these or other individuals will not have access to such detailed, individualized information—so it is not material to the risk of arrest. Nor have Defendants "provided sufficient details" about how these questions would bear on their enforcement decisions. *Christian Healthcare Centers, Inc. v. Nessel*, 117 F.4th 826, 854 (6th Cir. 2024). Indeed, such cooperation is irrelevant to H.B. 1704— and Defendants do not contend otherwise—so "there is not 'a single additional fact that would be

4

required to adjudicate the present action.'" *Id.* at 851 (citation modified); *see id.* ("enforcement more credible" in such circumstances); *see also Nabors*, 35 F.4th at 1035 (enforcement credible where defendants took "no meaningful steps" to disavow intent to prosecute).[2]

## II.     H.B. 1704 IS PREEMPTED.

1. Defendants' argument that H.B. 1704 is not field preempted, Opp. 16-22, ignores both the dominant federal interest in removal and the pervasive federal framework governing removal, Mot. 9-12—either of which is enough on its own to establish a preempted field. *See Arizona v. United States*, 567 U.S. 387, 399 (2012).[3] And notably, in its Statement of Interest, the United States does not contest that removal is a preempted field. Dkt. 30 at 6.

Defendants have no answer to the long list of cases resoundingly concluding that removal is the sole prerogative of the federal government. *See* Mot. 9-10; *see also Arizona*, 567 U.S. at 409 ("removal process is entrusted to the discretion of the Federal Government"); *Truax v. Raich,* 239 U.S. 33, 42 (1915) ("The authority to . . . exclude aliens—is vested solely in the Federal Government"); *United States v. Alabama*, 691 F.3d 1269, 1293 (11th Cir. 2012) ("power to expel aliens has long been recognized as an exclusively federal power") (citing cases). That is plainly a dominant federal interest. Defendants' silence on this point speaks volumes.[4]

---

[2] Defendants contend that Plaintiffs' injuries cannot be traced to or redressed by Attorney General Skrmetti. Opp. 12-13. But Tenn. Code Ann. § 8-7-103(3) empowers the Attorney General to direct the district attorneys general to assist in the "prosecution" of "all cases" in the circuit courts, which possess "exclusive original jurisdiction of all crimes and misdemeanors," Tenn. Code Ann. § 16-10-102. *Cf. Nabors*, 35 F.4th at 1032-33 (addressing different statutes for its traceability analysis).

[3] Defendants argue that Congress has not preempted the field of immigration more broadly. Opp. 19-20. That sets up a strawman; Plaintiffs contend that Congress has preempted the field of removal specifically. Mot. 9-14.

[4] Defendants invoke the presumption against preemption, Opp. 15, but "an 'assumption' of nonpre-emption is not triggered when the State regulates in an area where there has been a history of significant federal presence." *United States v. Locke*, 529 U.S. 89, 108 (2000). That is exactly the case as to the field of removal. *See supra*; *see also* Mot. 10-12.

Defendants attempt to limit field preemption to noncitizen registration, which they argue implicates "the just rights of a country's own nationals." Opp. 20. But this same reasoning applies to H.B. 1704, which deprives noncitizens of their rights to live in their homes. Mot. 12. Moreover, the decision to expel a noncitizen is even more sensitive than alien registration because "[r]emoval decisions . . . 'implicate our relations with foreign powers' and require consideration of 'changing political and economic circumstances.'" *Jama v. ICE*, 543 U.S. 335, 348 (2005); *see United States v. Texas*, 599 U.S. 670, 679 (2023) (similar); *Arizona*, 567 U.S. at 409 (similar). These foreign affairs implications, as well as the long-established sovereign power to remove noncitizens, Mot. 9-10, make this case a far cry from *Kansas v. Garcia*, Opp. 18. That case involved prosecutions based on *tax* paperwork—which, the Court held, did not impinge on federal *work authorization* statutes. 589 U.S. 191, 195, 208-10.[5]

On the federal framework, Defendants seek to narrow Congress's handiwork to "two federal [crimes]." Opp. 21; *see also* Opp. 18. But Defendants overlook the fact that these provisions do not exist in a vacuum—nor do federal officials employ them as if they do. Rather, § 1253 is part of a larger criminal *and* civil framework regulating removal, where federal officials have discretion to choose, *inter alia*, whether to execute removal orders or prosecute noncitizens for failure to depart. *See AADC*, 525 U.S. at 483-84 (federal discretion to choose when to execute a removal order). These provisions are designed to work together, organized around federal discretion; for example, it would make no sense for federal officials to

---

[5] In any event, the Supreme Court has been clear that States are permitted a role in regulation of *employment* of noncitizens that is not the case with core sovereign powers like removal. *See De Canas v. Bica*, 424 U.S. 351, 354-55 (1976) (emphasizing that the "[p]ower to regulate immigration is unquestionably exclusively a federal power" but upholding state employment law that had a "purely speculative and indirect impact on immigration").

6

simultaneously order a noncitizen to show up for check-ins and provide a work permit while also prosecuting them under § 1253. Mot. 16.

Failing to grapple with the comprehensiveness of this framework, Defendants instead argue that federal law "invites State participation" in removal, suggesting that "federal law teems with references to state involvement." Opp. 16-17.[6] That "federal law specifies *limited* circumstances in which state officers may perform the functions of an immigration officer" does not give states license to set up their own removal scheme. *Arizona*, 567 U.S. at 408-09 (emphasis added) (citing 8 U.S.C. § 1357(g)). And limited, congressionally sanctioned state participation in an arena does not undermine a finding of field preemption. For example, in *Pacific Gas & Electric Co. v. State Energy Research Conservation & Development Commission*, Congress permitted "agreements" where States would assume "regulatory authority over certain nuclear materials" and "specifically authoriz[ed]" States to regulate air pollutants. 461 U.S. 190, 209 & n.20, 212 n.25 (1983) (cited by Defendants). The Supreme Court nevertheless concluded that "the federal government has occupied the entire field of nuclear safety concerns, *except the limited powers expressly ceded to the states*." *Id.* at 212 (emphasis added). So too here.[7]

---

[6] None of the provisions Defendants cite, Opp. 17, invite states to decide whether and when to execute removal orders. *See, e.g.*, 8 U.S.C. § 1231(a)(2)(B) (detention during removal period); *id.* § 1253(e) (granting visas).

[7] Defendants argue that 8 U.S.C. § 1229a(a)(3) is an express preemption provision that limits implied preemption by implication. Opp. 19 (citing *Freightliner Corp. v. Myrick*, 514 U.S. 280, 288-89 (1995)). The Supreme Court has rejected any such displacement of "ordinary [implied] pre-emption principles." *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 352 (2001) (citing *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 869 (2000)). In any event, there would be no such implication of non-preemption to be drawn here; § 1229a(a)(3)'s exclusivity language applies to (and was originally directed at) other *federal* mechanisms, *see Marcello v. Bonds*, 349 U.S. 302, 309 (1955), so it does not remotely suggest Congress implicitly permitted state regulation of any removal matters so long as they are criminal.

7

Defendants correctly do not contest that H.B. 1704 regulates in the field of removal. Mot. 12-14. Although the United States asserts that H.B. 1704 merely requires noncitizens to leave Tennessee, Dkt. 30 at 6-7, "States may not enter, in any respect" a preempted field. *See Arizona*, 567 U.S. at 402 (state registration crime regulated in preempted field). Thus, courts have repeatedly found preempted regulations that, like H.B. 1704, require a noncitizen to leave a state or locality. Mot. 12-13 (citing cases). Indeed, if Tennessee can pass H.B. 1704, then "every State could give itself [this] independent authority," and noncitizens with removal orders could not reside anywhere in the country. *Arizona*, 567 U.S. at 402. And though Defendants emphasize that H.B. 1704 "relies . . . on federal determinations about an immigrant's legal status," Opp. 20, that is of no moment, because H.B. 1704 still regulates in the field of removal. *See Arizona*, 567 U.S. at 402 (state registration crime preempted even though it "has the same aim as federal law and adopts its substantive standards").

2. H.B. 1704 is conflict preempted because it strips federal discretion and authorizes unilateral state action. Mot. 14-20. Defendants contend that states may enact criminal laws that "closely track[]" federal law. Opp. 23-24. Whatever may be permissible in the context of other generally applicable state laws, here H.B. 1704 conflicts with Congress's extensive regulatory removal regime. *Iowa Migrant Movement for Just v. Bird*, 157 F.4th 904, 922 (8th Cir. 2025) (specifically distinguishing *Zyla Life Scis., L.L.C. v. Wells Pharma of Houston, L.L.C.*, 134 F.4th 326 (5th Cir. 2025), on which Defendants rely). Indeed, Defendants never confront Plaintiffs' showing that, as in *Crosby v. National Foreign Trade Council*, H.B. 1704's "unyielding application" of criminal sanctions "undermines the [executive's] intended statutory authority by making it impossible" for federal officials to chart the course they think best in individual cases. 530 U.S. 363, 377 (2000); *see* Mot. 19.

8

Defendants attempt to distinguish *Arizona* by arguing that H.B. 1704 does not allow the State to decide when a person is removable or when a removal order is valid. Opp. 24. But it allows the State to unilaterally arrest and prosecute noncitizens with removal orders for failing to depart regardless of federal choices and discretion. *See, e.g.*, Lucy Decl. ¶¶ 7-9 (describing check-ins with federal officials). That is, the State is "achiev[ing] its own immigration policy" for alleged violations of immigration law "without any input from the Federal Government," which is precisely what *Arizona* held conflict preempted. *Arizona*, 567 U.S. at 408, 410; *see Ga. Latino All. for Hum. Rts. v. Governor of Ga.*, 691 F.3d 1250, 1265 (11th Cir. 2012); Mot. 18-20.

Defendants suggest that the possibility of a conflict with "federal enforcement priorities" is not enough to find H.B. 1704 preempted. Opp. 24-25 (citing *Garcia*, 589 U.S. at 212). But this misunderstands Plaintiffs' argument. H.B. 1704 is preempted because it disregards Congress's "considered decision" to place a range of tools and the discretion to choose among them in the hands of federal officials. *Garcia*, 589 U.S. at 211. In the scheme it enacted, Congress established that federal officials alone have the discretion to balance multiple competing priorities, foreign relations, humanitarian considerations, and practical resource constraints. *Arizona*, 567 U.S. at 396-97, 408-10 (citing these issues as reasons why unilateral state action is preempted). That discretion therefore comes from *Congress* through the statutes it enacted in the INA, not from any enforcement priorities set by the Executive.[8] "Nothing similar" was present in *Garcia*. 589 U.S. at 211; *see Iowa*, 157 F.4th at 922 (rejecting reliance on *Garcia*); *Padres Unidos de Tulsa v. Drummond*, 785 F. Supp. 3d 993, 1005-07 (W.D. Okla. 2025) (same); *Fla. Immigrant Coal. v. Uthmeier*, 780 F. Supp. 3d 1235, 1263 & n.15 (S.D. Fla. 2025) (same).

---

[8] Indeed, Plaintiffs "point specifically to" the INA's removal statutes that "displac[e] or conflict[]" with [H.B. 1704]." *Va. Uranium, Inc. v. Warren*, 587 U.S. 761, 767 (2019) (plurality opinion) (cited by Defendants); Mot. 10-12, 15-16, 19.

9

Defendants contend that there is no conflict when H.B. 1704 is applied to noncitizens who are "likely" not under federal supervision. Opp. 25. This is wrong both factually and legally. After a removal order becomes final, the federal government must still decide whether to "execute" the order, and may instead grant a stay, confer deferred action, or simply "decline to execute" the order. *AADC*, 525 U.S. at 483-84; *id.* at 483-84 (deferred action); 8 U.S.C. § 1231(c)(2)(A)(ii) (discretionary stay of removal for noncitizen needed as a witness); 8 C.F.R. § 241.6(a) (discretionary administrative stay); *id.* §§ 1003.2(f), 1003.23(b)(1)(v), 1003.6(b) (discretionary stays). Indeed, the Supreme Court has confirmed that this discretion covers the decision "whether to remove a noncitizen from the United States." *Texas*, 599 U.S. at 679. Contrary to Defendants' claim, Opp. 25, the injunction thus cannot be limited to "individuals who are allegedly cooperating with active federal supervision." So long as a final order of removal remains unexecuted, the federal government retains discretion to remove, defer, or decline to execute it, and H.B. 1704 claims that discretion for the State of Tennessee.

*      *      *

Defendants claim there may be hypothetical valid applications of the statute.  Opp. 23.[9] That is wrong. Where a law is field preempted, every application of that law is preempted, because Congress has occupied the field and left no room for the State to operate. *See Arizona*, 567 U.S. at 401. And every time the State enforces H.B. 1704, it flouts Congress's direction that *federal* officials exercise discretion to decide whether and when to execute final removal orders. Thus, "every application of the Act stands as an obstacle to the accomplishment and execution of the full

---

[9] Defendants claim that courts routinely reject preemption challenges that are facial, pre-enforcement, or both, Opp. 23, but the cases they cite failed for reasons not present here. For example, the plaintiffs in *Friends of George's, Inc.* failed to establish standing, 108 F.4th at 438, and the state statute in *Fenner v. Gen. Motors, LLC*, found no preemption because the claim stemmed from state tort law, 113 F.4th 585, 601-02 (6th Cir. 2024).

10

purposes and objectives of Congress." *Iowa*, 157 F.4th at 927; *cf. L. W. v. Skrmetti*, 83 F.4th 460, 489-90 (6th Cir. 2023) (identifying purportedly valid applications). Indeed, *Arizona* found facial preemption despite a claim of hypothetical permissible applications. *See Arizona*, 567 U.S. at 408-10; *see id.* at 457-58 (Alito, J., dissenting in part) ("there are plenty of permissible applications").[10]

### III.  THE EQUITIES STRONGLY FAVOR AN INJUNCTION.

Plaintiffs, who face arrest, detention, prosecution, and removal from the state under H.B. 1704, have shown irreparable harm. Plaintiffs can be arrested at any moment as they go about their daily lives and thus face "a realistic prospect of harm in the immediate future." *Collins Inkjet Corp. v. Eastman Kodak Co.*, 781 F.3d 264, 280 (6th Cir. 2015); *Iowa*, 157 F.4th at 927 (threat of prosecution under state immigration law constituted irreparable injury); Mot. 20-21 (citing similar cases). That stands in stark contrast with the cases Defendants cite, Opp. 26, where the threatened harm turned on a chain of contingencies not present here. *See D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324 (6th Cir. 2019) (parents' possible future choices leaving child unenrolled in any school); *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) (future possible police choking without provocation).

The balance of equities and public interest also favor an injunction. Mot. 21-22. Defendants invoke the State's general interest in effectuating its laws. Opp. 26. But "[f]rustration of federal statutes and prerogatives [is] not in the public interest." *Alabama*, 691 F.3d at 1301; *Pub. Utils. Comm'n of Ohio v. United Fuel Gas Co.*, 317 U.S. 456, 469 (1943) (finding that preempted state action injures "the public interest"). And the injunction would not be advisory. Opp. 27. As

---

[10] That the Department of Justice has filed a brief supporting Defendants does not undermine preemption. Dkt. No. 30. "[T]he purpose of *Congress* is the ultimate touchstone in every pre-emption case." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (emphasis added) (citation modified). And the "views" of "an Executive Branch agency" do not control the meaning of Congress's statutes. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024); *see Iowa*, 157 F.4th at 924 (discounting amicus).

explained above, it would enjoin enforcement of a preempted statute that applies directly to Plaintiffs' current conduct and exposes them to imprisonment and removal.

## IV. CLASSWIDE RELIEF IS WARRANTED.

This Court should grant a preliminary injunction to a provisionally certified class, as numerous courts have done with laws similar to H.B. 1704. Dkt. 7 at 13 (citing cases). Where, as here, the class "meet[s] the requirements for class certification," it "should be provisionally certified." *Cameron v. Bouchard*, 462 F. Supp. 3d 746, 773-74 (E.D. Mich. 2020), *vacated on other grounds*, 815 F. App'x 978 (6th Cir. 2020); *Shreve v. Franklin County*, No. 2:10-cv-644, 2010 WL 5173162, at *10-16 (S.D. Ohio Dec. 14, 2010) ("[T]he Court grants class certification on a provisional basis."); *cf. Sharpe v. Cureton*, 319 F.3d 259, 273 (6th Cir. 2003) (cited by Defendants) (plaintiffs "never sought . . . class certification").

An injunction to a provisionally certified class is not a "universal injunction" because it is "limited . . . to the parties before the Court." Opp. 27; *see Trump v. CASA, Inc.*, 606 U.S. 831, 849-50 (2025) (approvingly distinguishing "the modern class action" from "the universal injunction" that "benefits parties and nonparties alike"). A classwide injunction is thus no broader and no more burdensome than necessary to provide relief. *See id.*

Finally, Defendants accuse Plaintiffs of delay.[11] But bringing class litigation against a novel attempt to seize control of federal immigration enforcement takes time, and Plaintiffs sued just one month after the statute was signed into law. The notion that they should have prepared months earlier, when the *idea* of this law was discussed, is fanciful. *See Dream Defs. v. DeSantis*, 559 F. Supp. 3d 1238, 1258, 1285-86 (N.D. Fla. 2021) (rejecting similar argument that plaintiffs

---

[11] In the interest of addressing certain statements in Defendants' brief, Plaintiffs note that they were deposed on a day that Defendants' counsel was available, Opp. 29, and shared their identities with Defendants' counsel in advance of the depositions, *see* Opp. 12 n.3.

12

"knew HB1 would pass" and finding three months to pursue injunction "well founded"), *rev'd on other grounds*, 119 F.4th 872 (11th Cir. 2024); *Georgia ex rel. Ga. Vocational Rehab. Agency v. United States*, 398 F. Supp. 3d 1330, 1347 (S.D. Ga. 2019) (finding two-and-a-half-month period reasonable for plaintiffs to pursue injunctive relief).[12]

Limiting the injunction to the Named Plaintiffs, as Defendants urge, Opp. 28, would be unworkable because it would require Plaintiffs to reveal themselves to the very officials they fear and require dissemination of their identity among law enforcement. *See Koe v. Noggle*, 688 F. Supp. 3d 1321, 1362 (N.D. Ga. 2023); *cf.* Dkt. 8. Indeed, without such dissemination of their identities, an injunction would not provide meaningful relief from arrest; it would merely furnish a defense after-the-fact. Finally, a limited injunction would invite repetitive, piecemeal litigation by each individual subject to H.B. 1704—precisely what Rule 23(b)(2) was designed to avoid.

Should the Court provisionally certify the class, and should further proceedings show that provisional class certification was unwarranted, the Court may alter or decertify the class at any time. *See* Fed. R. Civ. P. 23(c)(1)(C). The mere possibility of such developments, however, should not be a basis for denying interim relief to the class.[13]

**CONCLUSION**

The Court should grant a preliminary class-wide injunction.

---

[12] Defendants' bond arguments are also meritless. Defendants' highly "speculative" estimates about costs attributable to emergency Medicaid and criminal prosecutions are routine state expenditures rather than "costs and damages sustained by a party found to have been wrongfully enjoined." Fed. R. Civ. P. 65(c); *Appalachian Reg'l Healthcare, Inc. v. Coventry Health & Life Ins. Co.*, 714 F.3d 424, 431-32 (6th Cir. 2013). The Sixth Circuit has rejected states' standing based on such downstream purported harms. *Arizona v. Biden*, 40 F.4th 375, 383 (6th Cir. 2022). Those same theories cannot support a bond that could chill future public interest litigation.

[13] "[T]his Court may properly issue temporary injunctive relief to the putative class . . . ." *A.A.R.P. v. Trump*, 605 U.S. 91, 97 (2025). "Still, to tread the 'safest ground' when deciding whether a putative class may receive preliminary relief, the Court [should] provisionally certify the class." *L.G.M.L. v. Noem*, 800 F. Supp. 3d 100, 117 n.3 (D.D.C. 2025).

Dated: June 22, 2026

Hannah Steinberg**
Cody Wofsy*
Oscar Sarabia Roman*
Spencer Amdur*
American Civil Liberties Union
Foundation Immigrants' Rights Project
425 California Street, 7th Floor
San Francisco, CA 94104
Tel: (415) 343-0770
hsteinberg@aclu.org
cwofsy@aclu.org
osarabia@aclu.org
samdur@aclu.org

Noor Zafar**
Grace Choi*
Omar Jadwat*
American Civil Liberties Union
Foundation Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2660
nzafar@aclu.org
gchoi@aclu.org
ojadwat@aclu.org

/s/ *Lucas Cameron-Vaughn*
Lucas Cameron-Vaughn (BPR# 036284)
Zee Scout (BPR# 042637)
ACLU Foundation of Tennessee
P.O. Box 120160
Nashville, Tennessee 37212
Tel: (615) 320-7260
lucas@aclu-tn.org
zscout@aclu-tn.org

Peter McGraw**
Efrén Olivares**
Kevin Siegel**
National Immigration Law Center
1101 14th Street, Suite 410
Washington, D.C. 20005
Tel: (213) 639-3900
mcgraw@nilc.org
olivares@nilc.org
siegel@nilc.org

*Attorneys for Plaintiffs*
**Pro hac vice application forthcoming*
*** Pro hac vice application pending*

14

**CERTIFICATE OF SERVICE**

I hereby certify that on June 22, 2026, I electronically filed the foregoing with the Clerk of Court by using the District Court CM/ECF system.  All counsel of record are participants in the CM/ECF system.

/s/ *Lucas Cameron-Vaughn*
Lucas Cameron-Vaughn

15